UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| GARY I. ROTH, Ph.D., | **Civil Action No.** |
| Plaintiff, | **COMPLAINT** |
| v. | 1. Religious Discrimination in Violation of Title VII of the Civil Rights Act of 1964 |
| | 2. Retaliation in Violation of Title VII |
| BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA, | 3. Failure to Accommodate Religious Practices in Violation of Title VII |
| Defendant. | 4. Disability Discrimination in Violation of the Americans with Disabilities Act (ADA) |
| | 5. Retaliation in Violation of the ADA |
| | 6. Failure to Accommodate Disability in Violation of the ADA |
| | **JURY TRIAL DEMAND** |

### INTRODUCTION

1. This is an action for damages and injunctive relief arising from Defendants' discrimination, failure to accommodate, retaliation, and creation of a hostile work environment based on Plaintiff's disability and religious practices, in violation of the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act of 1964.

2. Plaintiff Gary I. Roth, Ph.D., a Senior Research Engineer with TOP SECRET security clearance, was employed by Defendants Georgia Institute of Technology and Georgia Tech Research Institute from September 13, 2021, until his wrongful termination on December 28, 2024.

3. Despite Dr. Roth's exemplary qualifications and demonstrated ability to work remotely, Defendants engaged in a pattern of discriminatory conduct including: refusing to properly accommodate his religious observances and disabilities, rescinding previously approved flexible work arrangements,

-1-

**ROTH v. BOARD OF TRUSTEES**                          **COMPLAINT**

issuing unwarranted disciplinary actions, removing him from projects, and ultimately terminating his employment in retaliation for engaging in protected activities.

4. Throughout his employment, Dr. Roth diligently requested accommodations for his Jewish religious observances and disabilities, filed internal complaints regarding discrimination, and opposed Defendants' unlawful practices, only to face escalating retaliation culminating in his termination.

5. Having exhausted his administrative remedies through EEOC Charge Number 570-2025-00128, Dr. Roth now seeks redress for Defendants' violations of federal law.

**PARTIES**

6. Plaintiff Gary I. Roth, Ph.D., is an Orthodox Jewish American who resides in Silver Spring, Maryland.  Dr. Roth was formerly employed by Defendants as a Senior Research Engineer from September 13, 2021, until his termination on December 28, 2024. At all times relevant herein, Dr. Roth was protected by Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (ADA), and, as he is a member of protected classes on account of his disability and religion. Dr. Roth performed his duties primarily in a remote capacity from his Maryland home.

7. Defendant Board of Regents of University System of Georgia, upon information and belief, is a public university and research institution that operates Georgia Tech, the Georgia Institute of Technology, and the Georgia Tech Research Institute ["GTRI"], Plaintiff Roth's employer. At all relevant times, GTRII was and is an employer within the meaning of Title VII and the ADA, employing more than 15 employees.

a. **JURISDICTION AND VENUE**

8. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. Jurisdiction of this Court is based on claims of deprivation of Federal Civil Rights and is invoked pursuant to the following statutes:

-2-

**ROTH v. BOARD OF TRUSTEES**                              **COMPLAINT**

     a.  28 U.S.C. § 1331, giving district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States; and

     b.  28 U.S.C. § 1343, giving district courts original jurisdiction over actions to secure civil rights extended by the United States government.

9. Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b).

10. Plaintiff has exhausted his administrative remedies by timely filing a Charge of Discrimination (Charge No. 570-2025-00128) with the Equal Employment Opportunity Commission (EEOC). Plaintiff received a Notice of Right to Sue from the EEOC on March 26, 2025, and files this action within ninety (90) days of receipt of that notice.

11. Dr. Roth is and was at all relevant times a resident of Montgomery County Maryland.

## JURY TRIAL DEMAND

12.   Dr. Roth demands a jury trial.

## FACTUAL ALLEGATIONS

13. Dr. Roth's first day of work with Georgia Tech Research Institute (GTRI) was on September 13, 2021, two days before the start of Yom Kippur, the evening of September 15th. It was smack dab in the middle of the Jewish High Holy days, with the week long celebration of Succoth to follow.

14. Prior to beginning work, Dr. Roth discussed his orthodox Jewish observances with Assistant Division Chief, Chuck Dunehew. The two agreed that Dr. Roth's religious observances would be accommodated by a combination of flexible scheduling, telecommuting and unpaid leave.

15. The flexible scheduling and telecommuting were especially important in the upcoming winter months, as Sabbath begins at sunset on Friday, and sunset times grow shorter during the winter months.

16. The telecommuting is especially needed on Fridays so that Dr. Roth does not have to leave work even earlier because of a lengthy commute home so that he can be home before the start of Sabbath.

-3-

**ROTH v. BOARD OF TRUSTEES**                    **COMPLAINT**

17. The flexible scheduling also enabled Dr. Roth to put in a full week's work, even if he had to work fewer hours on Friday.

18. Dr. Roth was hired as a Senior Research Engineer in the Electro-Optical Systems Laboratory (EOSL). Although the project was centered in Georgia, Dr. Roth performed his work remotely, dividing his time between the Washington area field station and his home in Montgomery County Maryland.

19. Dr. Roth continued to utilize the agreed upon flexible scheduling and telecommuting to enable him to observe Sabbath and Jewish Holy days, while performing his job duties.

20. In addition to being an Orthodox Jew, and requiring religious accommodation for his religious observances, Dr. Roth suffers from certain disabilities that also require accommodation by way of flexible scheduling.

21. Specifically, Dr. Roth is mildly autistic and has sleep disorders that affect both his ability to sleep, and to stay awake.

22. Because Defendants have policies that permit flexible scheduling, Dr. Roth worked effectively for about a year and a half without needing to submit formal requests for accommodation either for religion or disability.

23. Working conditions took a dramatic turn for the worse beginning in about February or March of 2023, after Dr. Roth and his supervisor, Terry Ogle, had a dispute about a technical issue. It appears that Ogle may have become frustrated and angry with Dr. Roth because he was unable to fix a problem, despite Dr. Roth proposing a solution, and offering to fix it.

24. On February 2, 2023, Ben Walker made changes to the code base that made it impossible for Ogle to integrate Dr. Roth's work with the project. On February 13, Ogle acknowledged the problem to Dr. Roth, and said he would fix it.

25. When Ogle was unable to fix the problem, he blamed Dr. Roth, and told him he does not intend to fulfill his supervisory obligation to find additional projects for him to work on.   Although Dr. Roth

-4-

**ROTH v. BOARD OF TRUSTEES**                                    **COMPLAINT**

offered to fix the problem on his own time, likely, that only made Ogle angrier, and he did not accept the offer.

26. Instead, he retaliated against Dr. Roth, threatening him on February 22 that he would require Dr. Roth to relocate to Atlanta in order to keep his job. Although he did not make good on the threat, Dr. Roth's workplace was never the same. Instead, it became hostile and oppressive.

27. Ogle followed up by issuing Dr. Roth a performance review in May, 2023 for the calendar year 2022 rating him "needs improvement." Reading the comments, it is clear Ogle dinged Dr. Roth not for his actual performance, but for two things: 1) his accommodation needs and their impact on his schedule; and 2) Ogle accused him of being too critical of the work of his coworkers, and not sufficiently supportive.

28. One comment is especially instructive: "Gary maintains his technical knowledge and job skills with professional development activities. He often generates innovative ideas that are sometimes worth consideration, but often they are not within the direction of the project or sponsor's interest." Translate: Dr. Roth is smarter than his supervisor who resents him and isn't interested in his brilliant ideas.

29. Dr. Roth sought to resolve the conflict with Ogle, by reaching out to Kyla Ross, Assistant Vice Provost for Advocacy and Conflict Resolution to arrange mediated discussions with Ogle. They met in April, 2023.

30. In May, 2023, Dr. Roth reached out to Danielle Lynch, Employee Relations Consultant, complaining about Ogle's issuing him an unfair performance evaluation for 2022. Lynch told Dr. Roth she found nothing amiss with the performance appraisal and offered to meet with him.

31. Dr. Roth asked for documentation from Lynch allegedly supporting her findings, and/or supporting the negative performance appraisal. Lynch then reversed course, and refused either to meet with Dr. Roth or provide him any documentation.

32. Dr. Roth pursued the issue further with the Legal department, but they declined to review the matter.

-5-

**ROTH v. BOARD OF TRUSTEES**                                   **COMPLAINT**

33. In June, 2023, Dr. Roth was required to submit a written request for flexible scheduling and telecommuting. After a painful bureaucratic run-around, a veritable Catch-22, Defendant denied his request for flexible scheduling. Ogle rejected it, allegedly because he didn't submit the form properly, but when Dr. Roth inquired of GTRI's Human Resource Department if he had completed the form correctly, Sonda Abernathy responded and contradicted Ogle's basis for rejecting the form.

34. Ogle first rejected Dr. Roth's Flex/Telecommuting request on June 14, 2023.

35. Dr. Roth protested to Division Chief Kyle Harrington that this was part of his deal when he was hired, in order to accommodate his religious observances.

36. Harrington responded on June 29, 2023,  by completely gaslighting Dr. Roth, claiming that his offer letter nullified that agreement.

37. Dr. Roth replied that same day, complaining that the denial of his Flex and Telecommute privileges was a violation of GTRIs code of ethics, and policy on workplace violence.

38. Dr. Roth also checked with all of his actual project supervisors, including Paul Miceli for whom Dr. Roth performed most of his work, and asked if they had any problem with his working from home, and they all said they did not. Miceli wrote: "I don't take issue with you working home."

39. On July 5, 2023, Dr. Roth tried to express his concerns to Don Davis, the Department Head, about needing Flex and Telecommute privileges as accommodations. Davis would not discuss it, and shut him down, saying: "this is not a negotiation."

40. In so doing, Davis flagrantly violated both Title VII and the ADA. Once an employer is on notice that an employee needs an accommodation, whether for religion or disability, it has an obligation to explore whether it can provide such an accommodation. It is not permitted to just reject the request and refuse to discuss it.

**Dr. Roth Submits Request for Medical/Disability Accommodation**

41. One week later, on July 12, 2023, Dr. Roth began the process of formally requesting a medical / disability accommodation. He obtained appropriate medical documentation from Dr. Mekonnen regarding his sleep disorders, and a second one from Dr. Duncan regarding his autism.

42. Dr. Roth received confirmation that Defendant received his medical documentation on or about August 3, 2023.

43. On August 16, 2023, Dr. Roth met with Ann Harris and Langston Jackson concerning his request for accommodation.

44. Thereafter, on August 29, Dr. Roth receives approval of his Medical RA Plan, effective August 22, 2023.

45. However, the RA Plan did not actually require Ogle to approve Dr. Roth's requests when he needed to flex his schedule or telecommute. As a result, Ogle consistently failed and refused to approve Dr. Roth's accommodation needs.

46. Nevertheless, Ogle signed the Medical RA plan on September 1, 2023. But no sooner had Ogle signed it, that he began to violate it, by instituting approval procedures that were medically unfeasible.

47. Following the rejection of his application for Flex/Telecommuting privileges by both Davis and Ogle, on August 7, 2023, Dr. Roth filed a complaint of misconduct with the Office of Ethics and Compliance ["OEC"] on August 14, 2023.

48. The OEC had a duty to investigate Dr. Roth's complaint, but failed and refused to do so, violating its own policies, and closing the case on August 25, 2023.

**Dr. Roth Submits Request for Religious Accommodation**

49. On July 28, 2023, Dr. Roth began the process of formally requesting religious accommodation.

50. On August 9, 2023, Jarmon DeSadier rejected Dr. Roth's religious accommodation request.

51. The following day, Dr. Roth requested to meet with DeSadier to understand and address his concerns, but DeSadier did not respond to his request, and did not meet with him.

-7-

ROTH v. BOARD OF TRUSTEES                           COMPLAINT

52. Dr. Roth then filed an Ethicspoint Concern on or about August 14, 2023 about the denial of his religious accommodation, and DeSadier's failure to respond to him.

53. He received a response from Melissa Hall on August 24, 2023. She informed Dr. Roth that his religious accommodation request was denied due to failure to provide requested information and/or documentation.

54. Dr. Roth asked what he had failed to provide, since he believed he had supplied everything requested.

55. OEC closed the case the next day, leaving Dr. Roth no closer to an understanding of what he needed to do to obtain a religious accommodation.

56. So Dr. Roth filed a second Ethicspoint Concern. on or about September 5, 2023, complaining that DeSadier would not meet with him to discuss his religious accommodation request.

57. Dr. Roth also resubmitted his request for a religious accommodation on September 27, 2023.

58. Finally, by email dated October 25, 2023, DeSadier informed both Dr. Roth, his supervisor [Ogle] and Danielle Lynch, an Employee Relations Consultant that his accommodation request had been approved, and that he was approved to flex his schedule in observance of the Jewish Sabbath, and to either flex his schedule or take leave in observance of Jewish holidays, with his schedule to be coordinated with his supervisor.

59. The terms of the Religious Accommodation request raised at least as many questions as it answered, since it was unclear how it was to operate in conjunction with Dr. Roth's disability accommodation. Furthermore, it also required Dr. Roth to get approvals from his supervisor, Ogle, which Dr. Roth already knew was not going to happen.

60. The RA approval stated: "This leave request [re: Jewish holidays] should be approved if associated with the observance of a Jewish Holiday."

61. The RA approval directed Dr. Roth to follow up with Danielle Lynch, which he did. But the ambiguity was never resolved. Ogle exercised his discretion to deny leave requests and then had the audacity to terminate Dr. Roth for allegedly taking leave without approval.

**ROTH v. BOARD OF TRUSTEES**                                    **COMPLAINT**

**Ongoing Harassment and Discipline**

62. Clearly, Dr. Roth's scheduling needs became his Achilles heel, so to speak, his prime vulnerability. Ogle laser focused on Dr. Roth's accommodation needs to harass him, issue him discipline, and eventually terminate him.

63. In September, 2023, Ogle issued Dr. Roth a "Memorandum of Expectations" ["MOE"] dated September 21, 2023. This memo focused on expectations regarding Dr. Roth's schedule.

64. Despite Dr. Roth having approved RA plans for both religion and disability, which acknowledged his need to utilize flex and telecommuting privileges, Ogle wrote: "You do not have an approved Telework agreement and are not authorized to work from home."

65. Ogle further stated: "You must notify your supervisor in advance (i.e., Ogle himself) or if that is not possible, immediately after such events. This accommodation does not permit you to work from home."

66. Thus, Ogle effectively nullified Dr. Roth's approved accommodation, and consistently refused to approve Dr. Roth's accommodations.

67. The MOE Ogle issued to Dr. Roth required him to work in the Washington DC field office and prohibited him from working from home.

68. In the only face to face meeting Dr. Roth had with Ogle in the three years of his employment, on September 19, 2023, Ogle, Davis and Sonda Abernathy meet with Dr. Roth to inflict the MOE on him. Ogle defended the requirement to work on site because the project was 100% classified. In fact, it was 100% unclassified.

69. Dr. Roth asked Ogle directly whether he had any other concerns about Dr. Roth's performance, and Ogle said he did not. The only concerns Ogle spoke about dealt with Dr. Roth's schedule and not being permitted to telecommute.

70. Despite the MOE stating there would be biweekly VTC meetings between the two of them, Ogle remained uncommunicative and unwilling to meet with Dr. Roth, shunning him.

-9-

**ROTH v. BOARD OF TRUSTEES**                                      **COMPLAINT**

71. Eight days after issuing the Memorandum of Expectations, effectively rejecting Dr. Roth's accommodation requests; on September 29, 2023, Ogle removed Dr. Roth from project D84ZM without notice or justification, significantly impacting his ability to perform his job duties and advance his career within the organization.

72. This was the only project Dr. Roth worked on with Ogle.

73. Dr. Roth had been hired specifically for that project because of his unique experience and expertise.

74. Removing Dr. Roth from the very project he had been hired on to participate in was demoralizing and harmful to his career, as well as blatant retaliation for seeking accommodation, which is a protected activity.

75. Dr. Roth had recently attended a discrimination and harassment training that taught that job transfers without notice could be retaliatory. When he asked Defendants whether his own transfer might be retaliatory, he was told it was not because Ogle had discretion to assign him wherever he was needed.

76. By raising questions about whether the transfer was retaliatory, Dr. Roth opposed discrimination and retaliation as tactfully as he could, and in so doing, engaged in a protected activity.

77. Thereafter, for the remainder of his employment, Ogle continued to harass Dr. Roth and deny him religious and disability accommodations while he worked on projects Ogle had absolutely nothing to do with.

78. In denying Dr. Roth the use of both flex time and telecommuting, Ogle subjected Dr. Roth to disparate treatment, in that most of those similarly situated employees who submitted flex scheduling requests were approved, and use of both flex and telecommuting privileges was widespread among coworkers who worked out of the Washington area field office.

79. Ogle singled out Dr. Roth for restrictions, denying him approved time off, and writing him up for taking time off to observe Jewish holidays.

**ROTH v. BOARD OF TRUSTEES**                                     **COMPLAINT**

80. With the exception of Dr. Roth's dealings with Ogle, his relationships with coworkers and supervisors was in all respects satisfactory and amicable, and none Dr. Roth's actual supervisors voiced any complaints about either his work product or his schedule.

81. While working under various project directors, including Paul Miceli, Dr. Roth requested his project directors to inform Ogle if his flexible time and/or location requirements ever caused any issues in completing the projects he was working on.

82. Paul Miceli told Dr. Roth his flexible time and workplace needs were not an issue. He also gave Dr. Roth glowing reviews during his performance evaluations.

83. Since Dr. Roth was no longer working under Ogle's supervision, he repeatedly but unsuccessfully asked to be transferred to a new line director. Ogle was not only not finding projects for Dr. Roth to work on, as he was required to do.  He was uncommunicative and interfering with Dr. Roth's accommodation needs.

84. Dr. Roth's disability accommodation was deemed temporary, to remain in effect until January 22, 2024.

85.  According to the RA Plan, Dr. Roth's ability to utilize a flexible schedule required supervisory approval.

86. Between October and December 2023, Defendant documented multiple alleged instances of schedule violations, despite knowing that the imposed schedule requirements conflicted with Dr. Roth's religious observances and medical needs.

87. On November 14, 2023, Dr. Roth received an email from Anne Forney confirming that his work could be performed remotely, directly contradicting the earlier rescission of his flexible work arrangements. It was clear that the only work that had to be done on site was that of any confidential nature.

88. On January 11, 2024, Dr. Roth filed a complaint with the United States Equal Employment Opportunity Commission, charge no. 570-2023-04023. In this charge, Dr. Roth complained that his religious and disability accommodation requests had been denied, and that he was transferred to

-11-

**ROTH v. BOARD OF TRUSTEES**                    **COMPLAINT**

another project in retaliation for complaining about discrimination and the denial of his accommodations.

89. Dr. Roth had previously expressed concern to Defendant that he would need to file an EEOC charge, and notified Defendant after he first contacted the EEOC and submitted an intake form.

90. On January 22, 2024, Defendants issued Dr. Roth a Reasonable Accommodation Plan extension, set to expire on June 22, 2024.

91. However, just two weeks later, on February 6, 2024, Defendant issued Dr. Roth a Written Warning. This warning came shortly after Dr. Roth filed a charge with the EEOC on January 11, 2024 and received a Notice of Right to Sue on January 24, 2024.

92. Dr. Roth promptly submitted a detailed response to the Written Warning on February 13, 2024, addressing each allegation and highlighting the retaliatory nature of the disciplinary action.

93. On June 21, 2024, Dr. Roth attended a meeting to review his modified Reasonable Accommodation Plan.

94. Sky Duckett emailed Dr. Roth to ask him why he had not signed the new plan. This inquiry came as a surprise to Dr. Roth for two reasons. First, after Dr. Roth reviewed a previous plan that Ogle failed to sign, Ann Harris informed him that the signatures were not required, that the plan went into effect regardless of whether they are signed and on the date specified in the accommodation plan. Second, because he had not received the plan after leaving the conversation with the impression that it was still being revised.

95. Dr. Roth was left with the understanding he did not have a reasonable accommodation plan in place.

96. Dr. Roth received a copy of the revised plan on July 24, 2024. This new accommodation plan Dr. Roth received was not signed by Ogle, nor did Ogle implement the new meetings the revised plan required.

-12-

**ROTH v. BOARD OF TRUSTEES**                                    **COMPLAINT**

97. The plan contains at least two acts of retaliation because it limited the project assignments Dr. Roth was able take relative to his coworkers therefore creating a critical risk to his being able to find adequate coverage.

98. The new plan also required Dr. Roth to start work every day by 8:00 a.m., contrary to the practice where employees are allowed to choose their daily start time between the window from 7:00 a.m. to 9:00 a.m.

99. On October 1, 2024, in accordance with his religious practices, Dr. Roth submitted a detailed religious holiday observance schedule, providing advance notice of required half-days and full leave days for Jewish holidays.

100.    Ogle did not respond to Dr. Roth's request for scheduling accommodations for his religious observances.

101.    On October 2, 2024, a new Reasonable Accommodation Plan was issued, unsigned.

102.    Rather than engaging in good faith discussions about religious accommodations, Defendant responded by issuing Dr. Roth a Final Written Warning on October 7, 2024, further escalating its campaign of discrimination and retaliation. In violation of Defendant's procedure, Ogle failed to send Dr. Roth a hard copy of the letter via certified mail.

103.    On October 14, 2024, Dr. Roth filed an EthicsPoint complaint regarding the discriminatory treatment he was experiencing. The Office of Ethics and Compliance dismissed his complaint on November 7, 2024, without conducting a thorough investigation.

104.    Throughout his employment, Ogle repeatedly rejected Dr. Roth's timesheets citing "Use of leave without approval," despite Dr. Roth's prior submission of religious observance schedules and approved accommodation plans.

105.    Defendant failed to properly evaluate or approve Dr. Roth's religious accommodation requests, instead implementing increasingly restrictive work rules that directly conflicted with his religious practices.

-13-

**ROTH v. BOARD OF TRUSTEES**                                      **COMPLAINT**

106.    Similarly, despite having an approved ADA accommodation plan, Defendant repeatedly failed to properly accommodate these medical needs, instead using them as a basis for disciplinary action.

107.    On December 19, 2024, Defendant issued Dr. Roth a termination letter effective December 28, 2024, in direct retaliation for his protected activities of requesting reasonable accommodations and reporting discrimination, harassment and retaliation.

108.    The three page letter cited insubordination as one ground for termination, but did not identify any such insubordination.

109.    The termination letter contained a "Summary of Events" that identified only scheduling "issues," such as "improper flexing of your work schedule, working remotely without prior approval, leaving work early without approval, taking leave without approval, and charging project codes for work done remotely over weekends."

110.    With very few exceptions, the many scheduling issues identified in this "Summary of Events" chronicle Ogle's failure and refusal to approve Dr. Roth's disability and religious accommodations, and document Ogle's campaign of harassment, retaliation and discrimination.

111.    Despite Defendant approving accommodations for Dr. Roth on paper, it remained at the sole discretion of a hostile supervisor to actually implement them, and he refused to do so.

112.    Throughout his employment, Dr. Roth engaged in multiple protected activities, including:

   a.   Submitting formal requests for religious and medical accommodations;

   b.   Filing complaints through GIT's EEO office;

   c.   Filing complaints through the Office of Ethics and Compliance;

   d.   Submitting complaints through the EthicsPoint system;

   e.   Filing complaints through internal HR channels; and

   f.   Submitting detailed rebuttals to unwarranted disciplinary actions.

113.    In response to these protected activities, Defendants engaged in a pattern of retaliatory actions, including:

   a.   Issuing a negative annual assessment on May 8, 2023;

-14-

**ROTH v. BOARD OF TRUSTEES**                              **COMPLAINT**

       b.   Removing Dr. Roth from projects;

       c.   Implementing progressive discipline including Written Warning, Final Written Warning, and termination;

       d.   Rejecting legitimate timesheets; and

       e.   Imposing restrictive and punitive implementation of accommodation plans.

114.    Dr. Roth has properly exhausted his administrative remedies by filing a Charge of Discrimination (Charge No. 570-2025-00128) with the Equal Employment Opportunity Commission. He received his Notice of Right to Sue on March 26, 2025, and files this action within the required ninety-day period.

**CLAIMS FOR RELIEF**
**COUNT I**
**Religious Discrimination**
**Title VII of the Civil Rights Act of 1964**
**(42 U.S.C. § 2000e et seq.)**

115.    Plaintiff re-alleges and incorporates herein by reference all of the above paragraphs, as though fully set forth herein.

116.    At all relevant times, Plaintiff was an employee within the meaning of Title VII, 42 U.S.C. § 2000e(f).

117.    At all relevant times, Defendants were employers covered by and within the meaning of Title VII, 42 U.S.C. § 2000e(b).

118.    Plaintiff is a member of a protected class based on his religion, i.e., his Orthodox Judaism.

119.    At all times relevant herein, Dr. Roth was qualified to perform his job duties, and did perform his job in a fully satisfactory manner.

120.    Defendant singled out Dr. Roth for discrimination and harassment by denying him the same Flex and Telecommute privileges enjoyed by his coworkers, by gaslighting him in giving him approval on paper for his religious accommodations, but denying them in practice.

-15-

**ROTH v. BOARD OF TRUSTEES**             **COMPLAINT**

121.    Defendant also required Dr. Roth to provide weekly notice of his need to observe Sabbath, something Dr. Roth found especially galling, demeaning and insulting. It was downright humiliating and harassing.

122.    As alleged above, Defendant subjected Dr. Roth to consistently poor performance reviews, and progressive discipline tied to his need for scheduling flexibility due to his religious observances.

123.    When Dr. Roth complained repeatedly about religious discrimination, harassment and retaliation, Defendant consistently failed and refused to follow its own policies and investigate his complaints, which is further evidence of discrimination.

124.    Finally, Defendant subjected Dr. Roth to a series of adverse employment actions including issuing him negative performance reviews that were not tied to his performance at all, but based on Defendant's own actions denying Dr. Roth's religious accommodation; removing him from the project he had been hired into, and transferring him; issuing him progressive discipline, subjecting him to constant harassment and a hostile work environment because of his religion, and finally, terminating his employment.

125.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has suffered and continues to suffer lost wages and benefits; emotional distress; damage to his professional reputation; and other economic and non-economic damages to be proven at trial.

126.    Plaintiff is entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT II**
Retaliation in Violation of Title VII
**(42 U.S.C. § 2000e et seq.)**

127.    Plaintiff re-alleges and incorporates herein by reference all of the above paragraphs, as though fully set forth herein.

128.    At all relevant times, Plaintiff was an employee within the meaning of Title VII, 42 U.S.C. § 2000e(f).

-16-

**ROTH v. BOARD OF TRUSTEES**                    **COMPLAINT**

129.    At all relevant times, Defendant was an employer covered by and within the meaning of Title VII, 42 U.S.C. § 2000e(b).

130.    Plaintiff's Orthodox Jewish faith and religious practices are sincerely held religious beliefs protected under Title VII.

131.    Plaintiff repeatedly engaged in protected activities including requesting religious accommodations, filing internal complaints through EthicsPoint, HR department and the Office of Ethics and Compliance, complaining of discrimination, harassment and retaliation to supervisors, Human Resources personnel, both orally and in writing, and by filing two EEOC charges (570-2023-04023 and 570-2025-00128).

132.    Defendant retaliated against Plaintiff for engaging in protected activities by rescinding previously approved accommodations, removing him from project assignments, issuing unwarranted disciplinary actions, creating a hostile work environment, and terminating his employment.

133.    Defendants' retaliatory actions were causally connected to Plaintiff's protected activities, as demonstrated by the temporal proximity between protected activities and adverse actions, the pattern of escalating adverse actions following complaints, the pretextual nature of disciplinary actions, and the ultimate termination of Dr. Roth's employment.

134.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer lost wages and benefits; emotional distress; damage to his professional reputation; and other economic and non-economic damages to be proven at trial.

135.    Plaintiff is entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT III**
**Failure to Accommodate Religion**
**Title VII**
**U.S.C. § 2000e et seq.)**

136.    Plaintiff re-alleges and incorporates herein by reference all of the above paragraphs, as though fully set forth herein.

-17-

ROTH v. BOARD OF TRUSTEES                    COMPLAINT

137.    At all relevant times, Plaintiff was an employee within the meaning of Title VII, 42 U.S.C. § 2000e(f).

138.    At all relevant times, Defendant was an employer covered by and within the meaning of Title VII, 42 U.S.C. § 2000e(b).

139.    Plaintiff's Orthodox Jewish faith and religious practices are sincerely held religious beliefs protected under Title VII.

140.    Prior to starting work Dr. Roth negotiated to obtain a Flexible work schedule and telecommuting privileges that would accommodate his religious scheduling needs. Plaintiff requested reasonable accommodations for his religious observance of Sabbath and Jewish holidays, practices, in the form of, time off to observe Jewish holidays, a modified work schedules during religious observances; and a flexible scheduling to accommodate religious obligations.

141.    As alleged above, Defendant reneged on this commitment in 2023, and while approving a religious accommodation in writing, failed and refused to implement the approved religious accommodations.

142.    Thus, Defendant effectively denied Dr. Roth religious accommodation.

143.    Defendants failed to reasonably accommodate Plaintiff's religious practices by:

    a.   Refusing to approve time off for religious observances;

    b.   Rejecting timesheets that included religious holiday observances;

    c.   Implementing work rules that conflicted with religious practices;

    d.   Using his religious observances as grounds for discipline; and

    e.   Terminating his employment rather than accommodating his religious practices.

144.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer lost wages and benefits; emotional distress; damage to his professional reputation; and other economic and non-economic damages to be proven at trial.

145.    Plaintiff is entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

-18-

**ROTH v. BOARD OF TRUSTEES**                              **COMPLAINT**

**COUNT IV**
**Disability Discrimination**
**in Violation of the Americans with Disabilities Act**
**42  U.S.C. § 12101 et seq.)**

146.    Plaintiff re-alleges and incorporates herein by reference all of the above paragraphs, as though fully set forth herein.

147.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102.

148.    At all relevant times, Defendant was an employer covered by and within the meaning of the ADA, 42 U.S.C. § 12111(5).

149.    Plaintiff was qualified to perform the essential functions of his position as Senior Research Engineer with or without reasonable accommodation.

150.    Plaintiff fully complied with his obligation to provide medical documentation supporting both the fact of his disability and his need for accommodation.

151.    By issuing Dr. Roth an approval and a Reasonable Accommodation Plan, Defendant acknowledged that Dr. Roth's sleep disorders substantially limited a major life activity, i.e., sleep.

152.    But for Dr. Roth's disability and need for accommodation, Defendant would not have subjected him to a series of adverse employment actions including:

       a.   Refusing to properly implement approved accommodations;

       b.   Using his need for Flex time and Telecommuting as a basis for disciplinary action;

       c.   Rescinding previously approved flexible work arrangements;

       d.   Removing him from projects;

       e.   Issuing unwarranted disciplinary actions; and

       f.   Ultimately terminating his employment.

153.    Dr. Roth's disability was a substantial motivating factor for the adverse and discriminatory actions taken against him.

**ROTH v. BOARD OF TRUSTEES**                                        **COMPLAINT**

154.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has suffered and continues to suffer lost wages and benefits; emotional distress; damage to his professional reputation; and other economic and non-economic damages to be proven at trial.

155.    Dr. Roth further claims a right to recover attorneys fees and costs pursuant to 42 U.S.C. § 12205.

**COUNT V**
**Retaliation in Violation of the ADA**
**42  U.S.C. § 12203)**

156.    Plaintiff re-alleges and incorporates herein by reference all of the above paragraphs, as though fully set forth herein.

157.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102.

158.    At all relevant times, Defendant was an employer covered by and within the meaning of the ADA, 42 U.S.C. § 12111(5).

159.    Plaintiff was qualified to perform the essential functions of his position as Senior Research Engineer with or without reasonable accommodation.

160.    Plaintiff engaged in protected activities including:

    a.    Requesting reasonable accommodations for his disability;

    b.    Filing complaints through GIT's EEO office;

    c.    Filing complaints through the Office of Ethics and Compliance;

    d.    Submitting complaints through the EthicsPoint system;

    e.    Filing complaints through internal HR channels; and

    f.    Opposing discriminatory practices.

161.    In response to these protected activities, Defendant engaged in adverse employment actions including:

    a.    Issuing a negative annual assessment on May 8, 2023;

-20-

ROTH v. BOARD OF TRUSTEES                    COMPLAINT

     b.   Removing Plaintiff from projects;

     c.   Implementing progressive discipline including Written Warning, Final Written Warning, and termination;

     d.   Rejecting legitimate timesheets;

     e.   Imposing restrictive and punitive implementation of accommodation plans; and

     f.   Ultimately terminating his employment.

162.   A causal connection exists between Plaintiff's protected activities and the adverse employment actions taken against him.

163.   As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered damages including lost wages, benefits, emotional distress, and other damages to be proven at trial.

164.   Dr. Roth further claims a right to recover attorneys fees and costs pursuant to 42 U.S.C. § 12205.

**COUNT VI**
**Failure to Accommodate Disability**
**in Violation of the ADA**
**42 U.S.C. § 12101 et seq.)**

165.   Plaintiff re-alleges and incorporates herein by reference all of the above paragraphs, as though fully set forth herein.

166.   At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102.

167.   At all relevant times, Defendant was an employer covered by and within the meaning of the ADA, 42 U.S.C. § 12111(5).

168.   Plaintiff was qualified to perform the essential functions of his position as Senior Research Engineer with or without reasonable accommodation.

169.   Plaintiff requested reasonable accommodations for his disability, including:

     a.   Flexible scheduling;

     b.   Remote work arrangements; and

-21-

c. Modified work schedules to accommodate medical care.

170. These requested accommodations would have allowed Plaintiff to perform the essential functions of his position without causing undue hardship to Defendants.

171. Despite approving Dr. Roth's accommodation and issuing a Reasonable Accommodation Plan, Defendant failed to implement the Plan, leaving it to the discretion of his supervisor, Mr. Ogle, who consistently used Dr. Roth's need for accommodation as a means of harassing and retaliating against him.

172. Despite Dr. Roth's repeated and frequent complaints to EthicsPoint, the HR department, and to the Office of Ethics and Compliance, Defendant failed to remedy the lack of a reasonable accommodation.

173. Defendant refused to properly implement approved accommodations, imposed unreasonable restrictions on approved accommodations; used Dr. Roth's need for accommodation as grounds for discipline, issuing negative performance reviews and progressive discipline tied to his scheduling needs; and finally, terminating Dr. Roth's employment.

174. As a direct and proximate result of Defendants' failure to accommodate, Plaintiff has suffered damages including lost wages, benefits, emotional distress, and other damages to be proven at trial.

175. Dr. Roth further claims a right to recover attorneys fees and costs pursuant to 42 U.S.C. § 12205.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gary I. Roth, Ph.D., respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

1. Declare that Defendants violated Plaintiff's rights under the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964 to be free from discrimination, harassment, and retaliation in the workplace;

2. Award back pay and front pay, including lost wages and benefits, in amounts to be determined at trial, together with prejudgment interest at the maximum rate permitted by law;

-22-

**ROTH v. BOARD OF TRUSTEES**                    **COMPLAINT**

3.    Award compensatory damages for emotional distress, mental anguish, pain and suffering, damage to professional reputation, and other non-economic damages in an amount to be determined at trial;

4.    Award all appropriate Injunctive relief including but not necessarily limited to:

a.    Ordering Defendant to reinstate Plaintiff with appropriate accommodations for his disability and religious practices;

b.    Ordering Defendant to implement effective policies and procedures for handling accommodation requests;

c.    Mandating comprehensive training for Defendants' managers and supervisors and human resources personnel regarding religious and disability accommodations, discrimination, harassment, and retaliation;

d.    Requiring Defendants to maintain records of all accommodation requests and their disposition;

5.    Award attorneys' fees and costs incurred in this action under 42 U.S.C. § 1988 and 42 U.S.C. § 12205;

6.    Award pre-judgment and post-judgment interest as allowed by law; and

7.    Such other and further relief as this Court deems just and proper.


Respectfully submitted this 23rd day of June, 2025.


/s/ Todd R. McFarland
Todd R. McFarland
D. Md. Bar No. 28777
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD
mcfarlandt@gc.adventist.org
Tel:  301-680-6321

-23-

**ROTH v. BOARD OF TRUSTEES**                               **COMPLAINT**

Alan J. Reinach (*pro hac vice* pending)
ajreinach@churchstate.org
Jonathon S Cherne (*pro hac vice* pending)
Jcherne@churchstate.org
CHURCH STATE COUNCIL
2686 Townsgate Rd.
Westlake Village CA 91361
Tel: 805-413-7398
Fax: 805-778-8843

Attorneys for Plaintiff GARY I. ROTH, Ph.D.

-24-

**ROTH v. BOARD OF TRUSTEES**                          **COMPLAINT**